# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, *ex rel*.

[UNDER SEAL]


*Plaintiff*

v.


[UNDER SEAL]


[UNDER SEAL]


*Defendants*.

Case No. _____


**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq.**

**FILED UNDER SEAL**

**Jury Trial Demanded**

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, *ex rel.*

WILLIAM LAWRENCE

    16321 SE Maple Hill Lane
    Happy Valley, OR 97086

     *Plaintiff,*

v.

INTERNATIONAL BUSINESS MACHINE
CORPORATION

    1New Orchard Road
    Armonk, New York 10504-1722

SETERUS, INC.

    14523 Southwest Millikan Way
    Suite 200
    Beaverton, OR 97005

     *Defendants.*

Case No. _____

**Complaint for Violations of the
Federal False Claims Act, 31
U.S.C. §§ 3729 et seq.**

**FILED UNDER SEAL**

**Jury Trial Demanded**

## INTRODUCTION

1.      This is a *qui tam* action brought by relators William Lawrence ("Lawrence" or "Relator") on his own behalf and on behalf of the United States of America ("United States") against Defendants International Business Machine Corporation ("IBM") and Seterus, Inc. ("Seterus")(collectively "Defendants,") to recover damages, penalties, attorneys' fees and other relief owed to the United States and co-relators for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq., ("FCA" or "False Claims Act").

2.      IBM is one of the most well-known corporations in America. Publically traded and responsible for the employment of more than 400,000 employees, it is considered a leader in numerous technology markets.

3.      Seterus is a subsidiary of IBM which, until June 7, 2011, was known as IBM Lender Business Process Services.

4.      Prior to being acquired by IBM, the company was known as Wilshire Credit Corporation (WCC).

5.      IBM acquired WCC in October 2009 in order to enter into the subprime mortgage loan servicing business.

6.      Prior to the IBM acquisition, WCC had been involved in pension fraud. Its CEO served sixteen months in prison after pleading guilty to the filing of a false tax return and providing illegal gratuities.

7.      Shortly after the acquisition of WCC, IBM entered into a contract with the Federal National Mortgage Association ("Fannie Mae") to provide loan servicing support services on a portfolio estimated to be greater than $10,000,000,000.

8.      The Better Business Bureau has received 491 complaints against Seterus in just the past three years, half of which pertain to billing and collection issues.

9.      Employees for IBM and Seterus often work out of the same facility and many IBM employees have transitioned to Seterus and vice versa.

10.     Fannie Mae is a government sponsored enterprise (GSE) commissioned by the United States Congress "to keep money flowing to mortgage lenders, to help strengthen the U.S. housing and mortgage markets, and to support affordable homeownership."

11.     Fannie Mae contracts with loan servicing companies to manage payments from borrowers, and, in the event that payments are not being made, to ensure that property values remain intact during the foreclosure process.

12.     Defendants are loan servicing companies supporting Fannie Mae.

13.     Relator is a Certified Public Account (CPA) employed by Seterus as a Line Business Controls Analyst.

14.     Relator has uncovered numerous fraudulent business practices in regards to Defendants' business relationship with Fannie Mae.

15.     Relator has on multiple occasions brought this fraudulent activity to senior management and, each time, has been rebuffed.

16.     Relator has proactively attempted to implement internal controls that would eliminate the fraudulent activity; however, his recommendations have never been implemented.

17.     Defendants have and continue to engage in fraud related to two Fannie Mae programs.

18.     The first program ("Form 571 Expense Claim Process") relates to the manner in which foreclosure-related expenses are reimbursed to Defendants. The second program is Fannie

4

Mae's Borrower Response Package (BRP) Collection Incentive/Fee Program ("BRP Collection Incentive/Fee Program"), which provides performance bonuses when a loan servicer's BRP collection rate exceeds a specified percentage and compensatory fees when the BRP collection rate falls below a specified percentage.

19.     In connection with Fannie Mae's reimbursement to loan servicers for foreclosure-related expenses ("Form 571 Expense Claim Process") and its program to provide performance bonuses to servicers that meet specified targets in the collection of Borrower Response Packages ("BRP Collection Incentive/Fee Program") , Defendants committed fraud against Fannie Mae by:

   (i) knowingly presenting, and causing to be presented to an officer and employee of the United States Government false and fraudulent claims for payment and approval;

   (ii) knowingly making, using, and causing to be made and used, false records and statements to get false and fraudulent claims paid and approved by the Government;

   (iii) having possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivering, or causing to be delivered, less than all of that money or property;

   (iv) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and

   (v) conspiring to commit each of the identified violations, in breach of 31 U.S.C. §§ 3729 *et seq*.

5

20.     Defendants have used their position as loan servicing companies to defraud the United States through a systemic pattern and practice of reporting inappropriate expenses for reimbursement and through overstating their performance in the collection of Borrower Response Packages (BRPs) in order to obtain unearned performance bonuses and to avoid compensatory fees.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over the claims alleged in this Complaint under 28 U.S.C. §§ 1331 and 31 U.S.C. § 3732(a).

22.     The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants both transact business within this District.

23.     Upon information and belief, this Complaint is not based upon allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party. 31 U.S.C. §3730(e)(3).

24.     Upon further information and belief, there has been no "public disclosure" of the matters alleged herein and this action is not "based upon" any such disclosure, within the meaning of 31 U.S.C. §3730(e)(4)(A). Notwithstanding the foregoing, Relator is the "original source" of this information as defined by 31 U.S.C. §3730(e)(4)(B) of the False Claims Act, and as such, is expressly excepted from the public disclosure bar.

## PARTIES

25.     Relator William Lawrence is a citizen of the United States of America and a resident of Happy Valley, Oregon.  Relator has nearly fifteen years of accounting and forensic accounting experience and has worked at two of the top five accounting firms – Grant Thornton and KPMG – in the country.

6

26.     At all material times, Lawrence was and is a Line Business Controls Analyst for Defendant Seterus and is a licensed Certified Public Accountant, No. 12244, in the state of Oregon.

27.     Lawrence has personal knowledge of the false records, statements and/or claims the Defendants presented to the Government and of Defendant's fraudulent practices.

28.     Defendant IBM is one of the most well-known corporations in the world. It is a publically traded company on the New York Stock Exchange (IBM), a multinational corporation with upwards of 400,000 employees, and a leader in numerous technology markets. It is headquartered in Armonk, New York.

29.     Seterus is a subsidiary of IBM which, until June 7, 2011, was known as IBM Lender Business Process Services. Prior to being acquired by IBM, the company was known as Wilshire Credit Corporation (WCC).

30.     IBM acquired WCC in October 2009 in order to enter into the subprime mortgage loan servicing business.

31.     Prior to the IBM acquisition, WCC had been involved in pension fraud.

32.     Its CEO served sixteen months in prison after pleading guilty to the filing of a false tax return and providing illegal gratuities.

33.     The Better Business Bureau has received 491 complaints against Seterus in just the past three years, almost half of which pertain to billing and collection issues.

34.     Employees for IBM and Seterus often work out of the same facility and many IBM employees have transitioned to Seterus and vice versa.

35.     IBM posts Seterus job openings on its website and references the company in its annual reports.

7

36.     Seterus identifies IBM as its parent company on its website and states that IBM may assist it in its everyday business processes.

37.     Shortly after the acquisition of WCC, IBM entered into a contract with the Federal National Mortgage Association ("Fannie Mae") to provide loan servicing support services on a portfolio estimated to be greater than $10,000,000,000.

38.     The Federal National Mortgage Association ("Fannie Mae") is a government sponsored enterprise (GSE) commissioned by the United States Congress "to keep money flowing to mortgage lenders, to help strengthen the U.S. housing and mortgage markets, and to support affordable homeownership."

39.     Fannie Mae is not an actual mortgage lender.

40.     Fannie Mae works with mortgage lenders, brokers, and servicers to assist potential homebuyers with securing affordable mortgages.

41.     Fannie Mae contracts with Defendants as loan servicing companies to keep track of consumers' actual mortgage payments, late and missed payments, liens, and management of other payment-related transactions with homeowners.

## FACTUAL ALLEGATIONS

### Background on Fannie Mae Programs

### Form 571 Expense Claim Process

42.     When a home loan goes into default, there are expenses that must be paid in order to protect the mortgage owner's property interest in the home.  Examples of such expenses include hazard insurance, local and state taxes, homeowner association fees, etc.

43.     Form 571, entitled *Cash Disbursement Request*, is used by loan servicing companies to request that Fannie reimburse the servicer for funds that is has expensed while

servicing mortgages during the foreclosure process.  A Form 571 may be submitted when a loan

is at least 90 days delinquent and has been reported to Fannie Mae for three consecutive

reporting cycles.

44.     There is typically a three step process to be completed by a loan servicer in order

to receive payment for a foreclosure-related expense that it has incurred. First, the servicer

completes the Form 571 and submits it via Fannie Mae's Asset Management Network (AMN).

Second, the servicer gathers supporting documentation related to the Form 571 submission and

compiles it in PDF format.  Lastly, the servicer attaches the PDF to an e-mail and sends the claim

documents to Fannie Mae.

45.     Fannie Mae will review each expense claim and reimburse the servicer for

foreclosure-related costs incurred every six months, or when the expense for a specific loan is

greater than $500.

46.     Defendants' process for claims reimbursement differs in several important

manners from that which has been described the preceding paragraphs.

47.     Defendants pay for foreclosure-related expenses using Fannie Mae's money, not

their own.

48.     Defendants hold an internal "forecasting" meeting where Defendants identify

their projected cash flow funding needs for foreclosure-related expenses.  During this meeting,

they estimate the amount of these expenses that they will incur in a given period.

49.     Cash flow funding needs are reported to Fannie Mae, which in turn makes

available the requested funds in one of its JP Chase Morgan bank accounts.

50.     Defendants have direct access to withdraw funds from this account.

51.     When Defendants incur a foreclosure-related expense (i.e., payment of an HOA fee, property preservation, etc.), the Operations Department uses money from this bank account rather than their own to make the necessary payments.

52.     Defendants' accounting practices dictate that these expenses should be recorded as accounting entries.

53.     No accounting records are made when a foreclosure-related expense is incurred and paid from Fannie Mae's bank account.

54.     Fannie Mae relies on Defendants to ensure that all disbursements made by Operations are in accordance with Fannie Mae's policies and guidelines.

55.     When a disbursement is made from the JP Chase Morgan account, Defendants' "Claims Group" is responsible for completing the Form 571 to justify the Operations Department's withdrawal of funds that has already occurred.

56.     The form is submitted to Fannie Mae for "approval," even though the funds have already been disbursed from a Fannie Mae bank account.

57.     If Fannie Mae does not agree with a particular expense claim, it can return the form to Defendants and reduces their future funding levels.

58.     Because of Defendants' poor accounting practices – namely that expenses are not recorded as accounting entries at the time they are incurred – it is incredibly difficult, if not impossible, for the Defendant to manage the repayment process to Fannie Mae.

59.     Though there have been some occasions where Fannie Mae has returned claims to the Defendants, the enormity of Fannie's operations makes it difficult, if not impossible, to identify all of the Defendants' inappropriate expense claims.

60.     Further complicating matters is the fact that Defendants are able to pay  for expenses directly from Fannie Mae's bank account as well as the state of disarray of Defendants' expense claims documentation.

### Borrower Response Package Incentive/Fee Program

61.     When a homeowner's property is in jeopardy of foreclosure, the loan servicer is required to send a foreclosure prevention solicitation letter, notifying the borrower of the potential of foreclosure.

62.     In addition to this solicitation letter, the loan servicer must also include a Uniform Buyer Assistance Form (Form 710A) and an IRS Form 4506T-EZ.  The foreclosure prevention solicitation letter and these two forms constitute what is referred to as the Borrower Response Package (BRP).

63.     The goal of the BRP is to provide the borrower with the information and resources to avoid further delinquency and mitigate the potential for a foreclosure on her home.

64.     Upon receiving the above described documents, the borrower must complete each of the forms and provide additional "hardship documentation," describing the reasons for missing their mortgage payments.

65.     The completed package will then be sent back to the loan servicing provider who then evaluates the response and makes the necessary foreclosure determinations.

66.     On September 2, 2011, Fannie Mae issued Servicing Guide Announcement SVC-2011-08R: *Delinquency Management and Default Prevention (Reissued),* which introduced new incentives and compensatory fees for BRPs for certain mortgage loans owned by Fannie Mae.

67.     As part of its Servicing Alignment Initiative, this "Carrot and Stick" type program was implemented to promote the collection of these BRPs by the loan service providers.

11

68.     In brief, loan servicing companies have the potential to earn bonuses or incur fees based on their ability to collect a specified percentage of BRPs from borrowers that have been lumped into various pools.

69.     The program operates at three levels: If the servicer produced complete BRPs for at least 60% of a given pool, the servicer would receive a bonus payment from Fannie Mae at $500 per completed BRP.  If the servicer completed BRPs for between 50% and 60% of a given pool, the servicer would not receive a bonus payment, but it would not owe Fannie Mae a fee either.  If the servicer produced less than 50% complete BRPs for a given pool, the servicer would have to pay Fannie Mae a fee for the uncollected BRPs.

70.     Defendant provides BRP collection information to Fannie Mae.

71.     Fannie Mae relies heavily on the accuracy of this data during the BRP review each month.

72.     Incentive payments or the assessment of fees are made based on the BRP collection information provided by the loan servicing companies.

## Uncovering Defendants' Fraud

### Form 571 Expense Claim Process

73.     Relator's position as a Line Business Controls Analyst responsible for evaluating and improving the internal controls of Defendants' accounting and claims practices.

74.     Beginning in late 2011, Relator began to suspect that Defendants were engaged in noncompliant accounting practices.

75.     From this time through the first quarter of 2012, Relator states that, on two separate occasions, Christine Dorrance, Seterus's Vice President of Accounting, disclosed to him

12

that Jay Memmott, President and Treasurer of Seterus, placed "extreme pressure" on her to record inappropriate accounting entries.

76.     At a meeting on March 9 of 2012, Lawrence was asked to perform an independent analysis on issues related to Form 571 Claims ("Claims") that were being submitted to Fannie Mae.

77.     At the March 9 meeting were Ms. Dorrance, Vice President of Line Business Control Brian Herzog, and Director of Operations Todd Roark.

78.     Ms. Dorrance was visibly upset during this meeting and stated several times that the accounting for the Claims was not within the scope of the review and urged that such a review of the Claims accounting was not to be performed.

79.     Nonetheless, a decision for Relator to proceed with the review was made.

80.     At the conclusion of the meeting, Lawrence approached Ms. Dorrance and asked her for the Claims files necessary to perform the requested analysis.

81.     Upon hearing Lawrence's request, Ms. Dorrance placed her head in her hands and stated, "It's all going to come out in the end anyway… It is what it is."

82.     From March of 2012 through May of the same year, Lawrence continued his analysis of the Form 571 Expense Claims Process.

83.     Between March and May 2012, he spoke with Jessica Ludlow, a member of the Claims Department.

84.     Ludlow stated that, during the first quarter of 2011, a conscientious decision was made and announced by Kathleen Zadnick of the Claims Department that all claims were to be filed, even when expenses were known to be improper.

13

85.    On May 10, Lawrence spoke with his direct manager, Brian Herzog, and asked if he could approach Ms. Dorrance and simply inquire as to whether or not the accounting for the Claims was correct.  Mr. Herzog responded, "No, let's not do that."

86.    On a subsequent occasion, Lawrence informed Tom Watson, the Managing Director of Business Controls, of Ms. Dorrance's allegations of pressure to record inappropriate journal entries by Mr. Memmott. No action was taken as a result of either conversation.

87.    On seven different occasions, Lawrence requested that Ms. Dorrance provide him with Claims data files that would allow him to perform his analysis.

88.    His requests for such information were never granted.

89.    On June 26, 2012, Lawrence issued his analysis entitled *Review of Form 571 Processes Report* which identified the weaknesses of Defendants' internal controls as they relate to the Form 571 process.

90.    Defendants' primary "controls" as they relate to the 571 Expense claim process are to send over an enormous number of expense claims to Fannie Mae and force Fannie Mae to identify those that are improper.

91.    Because Relator was not provided the necessary data files by Ms. Dorrance, he was only able to uncover the faulty accounting policies but cannot identify the precise number of fraudulently submitted expense claims.

92.    To date, neither he nor any other member of Line Business Controls has been allowed to review the propriety of historically submitted claims.

93.    In addition to his report, Lawrence developed a tool in June of 2012 that can be used to ensure claims are submitted in accordance with Fannie Mae guidelines. The use of this tool has never been implemented by the company.

14

**Borrower Response Package Incentive/Fee Program**

94.     Garrett Kimball is a contractor with IBM, serving as a Business Analyst to help improve various aspects of Defendants' auditing and reporting processes.

95.     Kimball and Relator Lawrence are members of the same church and, over the past twelve to eighteen months, have had brief interactions regarding the difficulty in working for Seterus.

96.     On or around September 1, 2012, Kimball approached Lawrence regarding a problem with Seterus's participation in the BRP Incentive/Fee Program.

97.     Kimball noted that Seterus was reporting that a significant amount of BRPs were being provided to Fannie Mae as "Complete," when, in fact, they were incomplete or missing altogether.

98.     Using the Defendants' IMPACT system, company employee Rita Biletski (Garrett Kimball's boss) runs a report that identifies the H-5s that are tagged as "Complete." This information is then transmitted to Fannie Mae for payment.

99.     Faulty business logic within the system resulted in Biletski submitting claims to Fannie Mae for payment which were not earned.

100.    In fact, while the information Defendants provided led to Fannie Mae owing Defendants' performance bonuses, in reality, Defendants likely should have been required to pay penalties.

101.    Later in September, a larger problem was uncovered in regards to the BRP Collection Incentive/Fee Program files.  During a review of the program, Ms. Rita Biletski of the Claims Department discovered that two loans in the system that appeared to be fictitious.

102.    She relayed these findings in an e-mail to several of her colleagues.

15

103.   At this point, Garrett Kimball was tasked to perform a more in depth analysis of the program, during which he discovered that there were potentially thousands of fictitious records that were using a "dummy" loan number of "12345."

104.   These records were being represented as "Complete" and sent to Fannie Mae as part of the BRP Collection Incentive/Fee Program files.

105.   Kimball provided his findings to Ms. Biletski.

106.   Garrett Kimball performed another audit of a statistically significant sampling of H-5s that were submitted to Fannie Mae for payment. He discovered that, of the H-5s in his report that Defendants had identified as being "Complete," only forty-two percent (42%) of the H-5s had actually been completed.

107.   Defendants were representing to Fannie Mae that they had successfully collected a grossly inflated amount of H-5s as compared to what had actually been obtained from the borrowers.

108.   Lawrence independently performed a similar such analysis that resulted in comparable findings.

109.   Using this 42% figure and number of actual H-5s that had been submitted to Fannie Mae, Lawrence performed an analysis to determine the extent to which Defendants had defrauded Fannie Mae.

110.   Relator's analysis revealed that from the period of December 2011 through September 2012, Defendants submitted 25,909 H-5s to Fannie Mae.

111.   According to the rules of the program, Defendants are due a $500 performance bonus for each submission.

112.   Collecting $500 for each of the 25,909 H-5s submitted results in a cost to Fannie Mae of $12,954,500.

113.   Defendants should not be eligible to collect any of this money.

114.   In fact, it is more likely that Defendants would have fallen in the "Fee Assessment" level, thus requiring Defendants to actually pay Fannie Mae for their poor collection effort.

115.   Relator does not have access to the contract which identifies the compensatory fee levied against Defendant should their collection effort place them in the "Fee Assessment" level of the program.

116.   In his analysis, Relator relies on some conservative estimates to come to the conclusion that Defendants, rather than receiving a performance bonus of $12,954,500, should have incurred a compensatory fee requiring them to pay Fannie Mae $4,806,450.

117.   Netting an unearned performance bonus of $12,954,500 with potential compensatory fees of $4,806,450 results in a loss to Fannie Mae of an estimated $17,760,950.

118.   In November, Lawrence's co-worker Jeremy Allen, Line Business Control Analyst, circulated an e-mail requesting information regarding any Fannie Mae audits of the BRP program.

119.   The next day, Erica Anson responded that Defendants' were able to pass their audit, even with the potentially thousands of "dummy" H-5s that had been submitted to Fannie Mae.

120.   Prior discussions indicate that management was fully aware of these dummy H-5s and, during the audit, they never identified the problem to Fannie's auditors.

**Additional Fraudulent Activity**

17

121.    In addition, Defendants' corporate culture actually promotes short cutting and illegal activity to cover up unsound business policies and mistakes.

122.    On his first day of working for Defendants, Lawrence was asked to review an audit report (LARC Report) that had been issued by Fannie Mae to the Defendants.

123.    Lawrence reviewed the report and stated to his manager Brian Herzog that Fannie Mae was essentially asking Defendants to provide them with the internal controls that would be used to execute work against the contract.

124.    Mr. Herzog responded that the company "Has made a business decision not to execute everything against the Fannie Mae contract that had been asked of them."

125.    In July of 2012, Pricewaterhouse Coopers ("PwC") was brought in to perform an audit of Defendants' internal controls.

126.    As a part of this audit, PwC reviewed the processes behind Defendants' removal of terminated employees from their information technology (IT) systems.

127.    PwC obtained a sample of terminated employees and compared this to a list of individuals with access to a particular IT system.  This comparison identified two terminated employees that still had access to the system.

128.    When the IT group was made aware of this, rather than admit fault and remove the terminated employees from the system, an IT employee doctored a screenshot of the system in an attempt to show that the terminated employees had, in fact, been deleted from the system within a day or two of termination.

129.    This doctored screenshot was presented to PwC during the course of its audit.

130.    Lawrence was tasked with looking into this screenshot and performed interviews and analyses to determine whether it was fraudulent.

18

131.    Ultimately, it was confirmed that the screenshot had been doctored.

132.    A period of time went by and Lawrence approached Renee O-, the individual who first noticed the doctored screenshot and who turned in the employee responsible, to learn what had resulted from his investigation.  Renee told Lawrence that, "They're not doing anything. What should I do?"

133.    Relator approached the Human Resources (HR) department to discuss his findings.

134.    In a meeting with HR as well as Tom Watson, Managing Director of Business Controls, Lawrence was told, in regards to the doctored screenshot, to "leave it alone" and to not tell anyone that it had happened.

### Management's Unwillingness to Take Action

135.    Management bonuses are largely tied to financial performance and a restatement of this magnitude would have a significantly negative impact on the financial position of the company and compensation of its executives.

136.    Defendants' lack of effective internal controls and broken accounting processes would require Defendants' employees to perform an arduous review of historical claims and BRPs.

137.    On seven different occasions, Lawrence requested that Ms. Dorrance provide him with Claims data files that would allow him to perform his analysis. His requests for such information were never granted.

138.    To date, management has shown little to no willingness to address the fraudulent activity going on within Defendants' operation.

19

## COUNT I
**Defendants Knowingly Presented False or Fraudulent Claims for Payment to the United States in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)**

139.    Relator realleges and incorporates the allegations set forth in paragraphs 1 through 138 above as though fully alleged herein.

140.    Defendant, by and through its officers, agents, supervisors, and/or employees, knowingly presented or caused to be presented to the United States, false or fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval pursuant to its contracts with the U.S. government in violation of 31 U.S.C. § 3729(a)(1).

141.    The United States, unaware of the falsity of the claims and/or statements made by Defendant and in reliance on the accuracy thereof, paid Defendant for such false or fraudulent claims.

142.    By reasons of the acts and conduct of Defendant in violation of 31 U.S.C. § 3729(a)(1), the United States has suffered actual damages, including the amounts paid in response to all such fraudulent claims for payment.

143.    Defendant has possession of government funds through its ability to access and withdraw money from Fannie Mae's bank account.

144.    Defendant withdrew funds From Fannie Mae's bank account to pay for Form 571 foreclosure-related expenses.

145.    Defendants submitted foreclosure-related expense claims to Fannie Mae for approval subsequent to withdrawing funds.

146.    The funds that Defendants withdrew from Fannie Mae's bank account and the expense claims that were submitted to Fannie Mae were false, and Defendants knew of such falsity.

20

147.     Senior management had direct, personal knowledge of the claims' falsity and, in fact, instituted a policy to knowingly submit false claims.

148.     The Relator verbally and in writing notified numerous Defendant employees of the false claims including Brian Herzog, Tom Watson, and Christine Dorrance among others.

149.     Other Defendant employees made similar claims, including Jeremy Allen, Garrett Kimball, Jessica Ludlow, Erica Anson, Judy Peterson, and Damian Lynch.

150.     Company President Jay Jemmott even participated in the fraud, pressuring Christine Dorrance, Seterus's Vice President of Accounting, to record inappropriate accounting entries.

151.     Defendants submitted false claims to the government regarding their collection rate of Borrower Response Packages (BRPs) in an effort to obtain unearned performance bonuses.

152.     Defendants submitted false claims to the government regarding their collection rate of BRPs in an effort to avoid paying compensatory fees.

153.     Defendant identified as "Complete," many BRPs that contained missing information.

154.     Defendant identified as "Complete," many BRPs for loans which did not even exist.

155.     E-mail correspondence indicates that Defendant employees Rita Bileski, Tracy Glen, and Nathen Wezal among others were aware of these fraudulently submitted claims.

156.     Fannie Mae has already paid Defendants for many of the fraudulently submitted claims and more payments are in queue for the upcoming months.

157.    Defendants rely on the enormity of Fannie Mae's business operations in order to avoid detection of these fraudulently submitted claims.

158.    Fannie Mae would not have paid, or would not have been obligated to pay, Defendants' claims had it known of Defendants' false claims.

159.    The United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the Relators, acting on behalf of and in the name of the United States of America, and on their own behalves, demand and pray that judgment be entered against Defendant for violations of the federal False Claims Act Counts as follows:

(a) In favor of the United States against the Defendant for treble the amount of damages to the federal government from the submission of false claims and the maximum civil penalties for each violation of the False Claims Act;

(b) In favor of the Relators for the maximum amount pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney fees and costs incurred by the Relators;

(c) For all costs of the False Claims Act civil action;

(d) In favor of the Relators and the United States for further relief as this court deems to be just and equitable;

(e) Such other relief as this Court deems just and appropriate.

Respectfully Submitted,

David Scher, NY Bar No. 2593036
R. Scott Oswald, *Pro Hac Vice to be filed*
*Counsel for Relator*

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com

23

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a jury trial.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiff's Amended

Civil Complaint and Demand for Jury Trial was served by certified mail, this 21st day of

November 2012, upon:

Preet Bharara, Esq.
U.S. Attorney for the Southern District of New York
One St. Andrews Plaza
New York, NY 10007

Eric Holder, Esq.
Attorney General of the United States
Office of the Attorney General, Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Respectfully Submitted,

David Scher