UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
WILLIAM LAWRENCE,                     :          12cv8433(DLC)
                        Plaintiff,    :
                                      :          OPINION AND ORDER
            -v-                       :
                                      :
INTERNATIONAL BUSINESS MACHINE        :
CORPORATION and SETERUS, INC.,        :
                                      :
                        Defendants.   :
                                      :
------------------------------------- X

For the Plaintiff:
Andrew M. Witko
David Scher
R. Scott Oswald
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006

For the Defendants:
Michael E. DeLarco
Allison J. Schoenthal
Hogan Lovells US LLP
875 Third Avenue
New York, New York 10022

Ty Cobb
Jessica Ellsworth
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004

DENISE COTE, District Judge:

     Plaintiff William Lawrence ("Lawrence") brings this action

against his former employer Seterus, Inc. ("Seterus") and its

parent company, International Business Machine Corporation

("IBM"), pursuant to the whistleblower provisions of the False

Claims Act ("FCA"), 31 U.S.C. § 3730(h)(1), and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), 15 U.S.C. § 78u-6 et seq. The defendants have moved to dismiss the Second Amended Complaint ("SAC") pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, the defendants' motion to dismiss is granted.

## BACKGROUND

The following facts are drawn from the SAC and are construed in favor of the plaintiff. See Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 68 (2d Cir. 2014). Lawrence is an experienced Certified Public Accountant. Lawrence was employed by Seterus as a Line Business Controls Analyst from at least late 2011 until December 10, 2012.

Seterus is a loan servicing company. Pursuant to a contract between its parent IBM and the Federal National Mortgage Association ("Fannie Mae"), Seterus managed mortgage payments and worked to ensure that property values would remain intact during foreclosure. Lawrence's allegations principally concern Seterus's participation in two Fannie Mae Programs: the Form 571 Expense Claims Process (the "Form 571 Program") and the Borrower Response Package Collection Incentive/Fee Program (the "BRP Program").

## I.  Form 571 Program

When a home loan goes into default, certain expenses must
be paid in order to protect the mortgage owner's property
interest in the home.  Loan servicers can be reimbursed by
Fannie Mae for these expenses through the Form 571 Program.
There is a three-step process for submitting a Form 571 Cash
Disbursement Request (hereinafter, a "Form 571 claim").  First,
the servicer must complete Form 571 and submit it via Fannie
Mae's Asset Management Network.  Second, the servicer must
gather supporting documentation related to the Form 571
submission and compile it in PDF format.  Finally, the servicer
must attach the PDF to an email and send the supporting claim
documentation to Fannie Mae.  Fannie Mae reviews each expense
claim and reimburses the servicer for foreclosure-related costs
incurred every six months, or when the expense for a specific
loan is greater than $500.

In late 2011, Lawrence learned from a Vice President of
Accounting ("V.P.") at Seterus that its President and Treasurer
had placed "extreme pressure" on her to record "inappropriate
accounting entries" related to Seterus's Form 571 claims.
During a March 9, 2012 meeting, Lawrence was asked to perform an
independent analysis of Seterus's accounting for the Form 571
claims.  During his review of the 571 claims accounting,

3

Lawrence uncovered a violation of Generally Accepted Accounting Principles ("GAAP"), specifically the requirement that costs incurred in a period be matched against revenue generated in the same period when an entity reports its net income for a specified accounting period.  Lawrence discovered that Seterus did not record "all" foreclosure-related expenses at the time the expenses were paid from Fainnie Mae's bank account, thereby causing Seterus to overstate its financial position.

On May 10, 2012, Lawrence approached his direct manager at Seterus to ask whether he could inquire of the V.P. if the Form 571 accounting was correct.  The manager responded: "No, let's not do that" or words to that effect.  Lawrence also asserts that he subsequently informed a Managing Director of Business Controls at Seterus about the pressure the V.P. experienced.

On June 26, Lawrence issued his "Review of Form 571 Processes Report" (the "Form 571 Report"), in which he described how Seterus's internal "controls" appeared to involve "nothing more than to send over an enormous number of expense claims to Fannie Mae and force Fannie Mae to identify those that were improper."  Lawrence circulated the Form 571 Report to Seterus executives and to a Service Business Controls Program Director for IBM.

In July, Lawrence met with the IBM employee to discuss the

4

alleged "accounting fraud" he had identified in his Form 571 Report.[1]  On September 15, Lawrence met with a member of IBM's Corporate Investigations unit to discuss Seterus's failure to remedy the "financial risks" he identified in his Form 571 Report.

## II.  BRP Program

When a homeowner's property is in jeopardy of foreclosure, a loan servicer will send the homeowner a Borrower Response Package ("BRP").  The BRP offers information and resources to mitigate the potential for foreclosure.  Included in the BRP is a foreclosure prevention solicitation letter, a Uniform Buyer Assistance Form (Form 710A), and an IRS Form 4506T-EZ.  Once a borrower receives the BRP, the borrower must complete the forms and provide additional "hardship documentation" explaining the reasons for missing mortgage payments.  Upon receipt of a completed package, the loan servicer will evaluate the response and make the necessary foreclosure determinations.

On September 2, 2011, Fannie Mae announced its BRP Program. The BRP Program provides incentives for the collection of

---

[1] The SAC refers to other efforts Lawrence made to speak with IBM employees in August and early September, about "accounting and billing improprieties," "internal control weaknesses" at Seterus, and concerns about the possibility of retaliation.  The SAC does not indicate precisely what these attempts to discuss issues with these IBM employees concerned or that the conversations occurred.

complete BRPs.  Under the program, if a loan servicer produces complete BRPs for at least 60% of a given pool, the servicer will receive a $500 bonus payment for each completed BRP.  If a servicer produces complete BRPs for 50 to 60% of a given pool, the servicer will not receive a bonus payment, but will not owe Fannie Mae a fee for the uncollected BRPs.  Lastly, if the servicer collects less than 50% completed BRPs, the servicer must pay Fannie Mae an unspecified fee for the uncollected BRPs.

A contractor with IBM discovered that Seterus had been overreporting to Fannie Mae the number of complete BRPs it had collected.  Apparently, "faulty business logic" within Seterus's database resulted in the submission of "claims to Fannie Mae for payments which were not earned."  The contractor was asked to perform an audit.  The audit of a statistically significant sample found that only 42% of claims identified to Fannie Mae as complete were actually complete.

Lawrence independently analyzed the database and came to a similar conclusion.  The SAC estimates that Seterus received approximately $12,954,500 in erroneous bonus payments over the first three quarters of 2012.

In November, Lawrence learned that Seterus had passed Fannie Mae's audit of the BRP Program.  The SAC asserts that "Seterus leadership" never identified the overreporting of

completed BRPs to Fannie Mae.

On December 5, Lawrence provided Seterus's Vice President of Line Business Controls with an Employee Fraud Prevention Scorecard for November 2012. Lawrence's scorecard identified potential risk areas within the company's "internal controls, and disclosed his concerns regarding the overstated BRP collection rates." On December 7, Lawrence reminded both that VP and the Managing Director of Business Controls that there was no existing control in place to ensure the accuracy of the BRP reports collection rate and that Seterus "had a duty to ensure the accuracy of its claims and disbursements." On December 10, Seterus terminated Lawrence's employment.

### III. Procedural History

On November 16, 2012, approximately one month before the termination of his employment, Lawrence filed a qui tam action under seal alleging that Seterus and IBM were violating 31 U.S.C. § 3729 of the FCA by requesting reimbursement from Fannie Mae for foreclosure-related expenses and by overstating the number of BRPs collected in order to receive bonus payments. After an investigation that ran over three years, the Government declined on June 27, 2016 to intervene pursuant to 31 U.S.C. § 3730(b). The qui tam complaint was unsealed on July 27, 2016.

Lawrence had already amended his complaint once before, on

January 16, 2013, and with the permission of the Court, Lawrence filed a second amended complaint ("SAC") on September 6, 2016, in which he dropped his substantive FCA claims. He retained the retaliation claims described below. On December 5, 2016, the defendants filed a motion to dismiss pursuant to Rule 12(b)(6).

On December 9, at an initial conference with the parties, Lawrence declined the opportunity to amend his complaint for a third time in response to the pending motion to dismiss. The Court noted:

> The plaintiff is requesting a substantial amount of time to respond [to the motion to dismiss], until January 19, and [the Court] wants to make sure . . . given the age of this case and the length of time that's passed since June, among other things, that this motion to dismiss when addressed will finally resolve the legal issues raised in the motion.

When asked whether the plaintiff intended to amend his complaint, counsel replied: "No, your Honor." Nevertheless, as memorialized in a December 9 Order, the plaintiff was provided until December 16 to amend his complaint. No third amended complaint was filed. The motion to dismiss became fully submitted on February 10, 2017.

On March 6, Lawrence requested that the Court take judicial notice of three documents in support of his opposition to the motion to dismiss. On March 8, the defendants filed a motion to strike the plaintiff's request for judicial notice. The motion

to strike became fully submitted on March 17.

For the reasons set forth below, the defendants' motion to strike is granted. The defendants' motion to dismiss is also granted.

## DISCUSSION

When deciding a motion to dismiss, a court must "accept all allegations as true and draw all inferences in the non-moving party's favor." LaFaro v. New York Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009) (citation omitted). "To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief." Keiler, 751 F.3d at 68; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (citation omitted)). A claim has facial plausibility when "the factual content" of the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal, 556 U.S. at 678 (citation omitted). In sum, "a

9

plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted).

## I.   Lawrence's Request for Judicial Notice

Lawrence seeks judicial notice of three documents.  In deciding a motion to dismiss, courts generally do not look beyond facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, documents integral to the complaint, and matters of which judicial notice may be taken.  Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).  A court may properly take judicial notice of "relevant matters of public record."  Giraldo v. Kessler, 694 F.3d 161, 164 (2d Cir. 2012). It is also "proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents."  Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).

The first two documents at issue include excerpts from a 2005 IBM Annual Report and a 2007 IBM Press Release.  These documents describe unrelated IBM accounting issues concerning a

10

separate client that predate the conduct at issue in this case. The third document -- a Financial Agency Agreement between the U.S. Department of the Treasury and Fannie Mae -- is proffered as evidence that Fannie Mae is a Government-Sponsored Enterprise ("GSE"). These three documents are irrelevant or unnecessary to resolve the present motion. Accordingly, the defendants' motion to strike the request for judicial notice is granted.

## II. IBM was not Lawrence's "employer" under the FCA or Dodd-Frank.

Lawrence was employed by Seterus. He has chosen, however, to sue not just Seterus but also its parent, IBM, for retaliation. The parties contest whether IBM was Lawrence's "employer" for purposes of his FCA and Dodd-Frank retaliation claims. Because Lawrence has not plausibly alleged a basis for claims of liability against IBM as his employer, the claims against IBM are dismissed.

Generally, "a parent is considered a legally separate entity from its subsidiary, and cannot be held liable for the subsidiary's actions based solely on its ownership of a controlling interest in the subsidiary." N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp., 766 F.3d 212, 224 (2d Cir. 2014). Neither the FCA nor Dodd-Frank define the term "employer." Where a statute does not define a term, "absent other indication, Congress intends to incorporate the well-settled

11

meaning of the common-law terms it uses." Universal Health

Servs., Inc. v. United States, 136 S. Ct. 1989, 1999 (2016)

(citation omitted) (applying this principle of interpretation to

the False Claims Act). Put differently,

> [w]here Congress borrows terms of art in which are
> accumulated the legal tradition and meaning of
> centuries of practice, it presumably knows and adopts
> the cluster of ideas that were attached to each
> borrowed word in the body of learning from which it
> was taken and the meaning its use will convey to the
> judicial mind unless otherwise instructed.

Sekhar v. United States, 133 S. Ct. 2720, 2724 (2013) (citation

omitted). Thus, "if a word is obviously transplanted from

another legal source, whether the common law or other

legislation, it brings the old soil with it." Id. (citation

omitted).

Where remedial statutes (such as employment discrimination

statutes) have failed to define the term "employer," the Second

Circuit has applied common law agency principles to determine

whether an employment relationship exists. See Salamon v. Our

Lady of Victory Hosp., 514 F.3d 217, 226 (2d Cir. 2008) (Title

VII case). The determination of an employment relationship

involves a fact-specific analysis of thirteen factors

articulated by the Supreme Court in Community for Creative Non-

Violence v. Reid, 490 U.S. 730 (1989). Salamon, 514 F.3d at

226. The Reid factors include:

[1] the hiring party's right to control the manner and
means by which the product is accomplished[;] .... [2]
the skill required; [3] the source of the
instrumentalities and tools; [4] the location of the
work; [5] the duration of the relationship between the
parties; [6] whether the hiring party has the right to
assign additional projects to the hired party; [7] the
extent of the hired party's discretion over when and
how long to work; [8] the method of payment; [9] the
hired party's role in hiring and paying assistants;
[10] whether the work is part of the regular business
of the hiring party; [11] whether the hiring party is
in business; [12] the provision of employee benefits;
[13] and the tax treatment of the hired party.

Id. at 227 (citing Reid, 490 U.S. at 751-52). This list is

"non-exhaustive." Id. The "most important" factor in

determining the existence of an employment relationship is

that control or right of control by the employer which
characterizes the relation of employer and employee .
. . . What is at issue is not merely the right to
dictate the outcome of the work, but the right to
control the 'manner and means' by which the hiree
accomplishes that outcome.

Id. at 228 (citation omitted).

Applying the relevant Reid factors here, the SAC does

not allege that IBM controlled the manner or means by which

Lawrence performed his accounting duties for Seterus. For

instance, there is no allegation that Lawrence was paid by

IBM, nor any suggestion that IBM was involved in the hiring

or daily supervision of Lawrence. Accordingly, pursuant to

common law agency principles, Lawrence has not plausibly

alleged that IBM was Lawrence's employer.

13

In opposition to this motion to dismiss, Lawrence urges the application of the single employer and joint employer doctrines to hold IBM liable under the FCA and Dodd-Frank. The single employer and joint employer doctrines were "developed to allow a plaintiff to assert employer liability in the employment discrimination context against entities that are not [the employee's] formal, direct employer." Griffin v. Sirva Inc., 835 F.3d 283, 292 (2d Cir. 2016) (citation omitted).

A "single employer" relationship exists where "an employee, formally employed by one entity, has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity." Brown v. Daikin Am. Inc., 756 F.3d 219, 226 (2d Cir. 2014) (citation omitted). Factors in determining whether a single employer relationship exists include: "(1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." Griffin, 835 F.3d at 292. No one factor is determinative, but control of labor relations is the central concern. Id.

A "joint employer" relationship exists where "two employers

handle certain aspects of their employer-employee relationship jointly." Id. (citation omitted).  Immediate control over the employees is an "essential element" of any joint employer determination.  Serv. Employees Int'l Union, Local 32BJ v. NLRB, 647 F.3d 435, 442 (2d Cir. 2011) (citation omitted).  In determining whether a joint employer relationship exists, courts look to whether the alleged joint employer:

> (1) did the hiring and firing; (2) directly administered any disciplinary procedures; (3) maintained records of hours, handled the payroll, or provided insurance; (4) directly supervised the employees; or (5) participated in the collective bargaining process.

Id. at 443 (citation omitted).

The Second Circuit has not addressed whether a corporate parent may be held liable for an FCA or Dodd-Frank retaliation claim under a single employer or joint employer theory of liability.  Assuming, arguendo, that these doctrines are applicable, the SAC does not plead facts to support their application here.

The SAC largely engages in group pleading, alleging that various actions were taken by the "defendants."  But group pleading will not suffice to hold a parent corporation liable under either the joint employer or single employer doctrines. The SAC's more concrete allegations do not allege facts from which a joint employer or single employer relationship between

15

IBM and Seterus can be plausibly inferred.  For example, the SAC alleges that "employees for IBM and Seterus often work out of the same facility" and "many IBM employees have transitioned to Seterus and vice versa."  It does not allege, for instance, that IBM exercised immediate control over Seterus's employees, that IBM controlled Seterus's labor relations, or that operations between IBM and Seterus were interrelated in a way that is relevant to this analysis.  While IBM entered into the contract at issue with Fannie Mae, as described in the SAC, the loan servicing work was performed by Seterus and it was Seterus that Fannie Mae audited.  And, while Lawrence sent copies of one report and spoke to certain IBM employees, his reporting obligations were owed to Seterus and he sent his written reports to his superiors at Seterus for their review.

The joint employer and single employer doctrines frequently require discovery to resolve.  See, e.g., Brown, 756 F.3d at 226 ("Whether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact not suitable to resolution on a motion to dismiss.").  But where the facts alleged on a pleading do not plausibly support the claims against a parent corporation, the claims against the parent corporation may properly be dismissed on a Rule 12(b)(6) motion. In sum, because the SAC does not plausibly allege that IBM was

Lawrence's direct employer, or that a joint employer or single employer relationship may have existed between IBM and Seterus, the motion to dismiss the retaliation claims against IBM is granted.

## III. FCA Retaliation Claim

The FCA is a statutory scheme designed to discourage fraud against the federal government.  See Universal Health Servs., 136 S. Ct. at 1996.  It "authorizes private citizens to sue on behalf of the United States to recover treble damages from those who knowingly make false claims for money or property upon the Government or who knowingly submit false statements in support of such claims or to avoid the payment of money or property to the Government."  United States ex rel. Lissack v. Sakura Glob. Capital Mkts., Inc., 377 F.3d 145, 146 (2d Cir. 2004); 31 U.S.C. § 3729(a)(1)(A)-(B).

The SAC alleges a violation of the FCA's whistleblower provision, 31 U.S.C. § 3730(h)(1) ("Section 3730(h)(1)"), which provides in relevant part:

> Any employee . . . shall be entitled to all relief
> necessary to make that employee . . . whole, if that
> employee . . . is discharged . . . or in any other
> manner discriminated against in the terms and
> conditions of employment because of lawful acts done
> by the employee . . . in furtherance of an action
> under this section or other efforts to stop 1 or more
> violations of this subchapter.

> An employee seeking to bring a cause of action under

Section 3730(h)(1) must prove that: "(1) he engaged in conduct protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." United States ex rel. Chorces as Trustee for Bankr. Estate of Fabula v. Am. Med. Response, Inc., 2017 WL 3180616, at *17 (2d Cir. July 27, 2017). "[P]roving a violation of § 3729 is not an element of a § 3730(h) cause of action." Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 545 U.S. 409, 416 n.1 (2005). Thus, Section 3730(h) "protects an employee's conduct even if the target of an investigation or action to be filed was innocent." Id. at 416.

To determine whether an employee's conduct was protected under the FCA, courts must evaluate whether "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." United States ex rel. Uhlig v. Fluor Corp., 839 F.3d 628, 635 (7th Cir. 2016) (citation omitted).[2]

---

[2] The defendants urge the adoption of the "distinct possibility" standard, which previously governed FCA retaliation claims. Prior to its amendment, the FCA's whistleblower provision defined protected activity as employee conduct "in furtherance of an action under this section, including investigation for,

18

"[M]ere investigation of an employer's non-compliance with federal regulations is not enough" to constitute protected activity under Section 3730(h)(1).  Fisch v. New Heights Acad. Charter Sch., No. 12cv2033 (DLC), 2012 WL 4049959, at *5 (S.D.N.Y. Sept. 13, 2012) (citation omitted).

"[A]lthough correcting regulatory problems may be a laudable goal, those problems [are] not actionable under the FCA in the absence of actual fraudulent conduct, and so reporting them [falls] outside the purview of the FCA's anti-retaliation provision."  United States ex rel. Booker

---

initiation of, testimony for, or assistance in an action filed or to be filed under this section."  See False Claims Amendment Act of 1986, Pub. L. 99-562, § 4, 100 Stat. 3153, 3157-58.  In interpreting this earlier version of § 3730(h)(1), courts adopted a "distinct possibility" standard, holding that "an employee engages in protected activity when litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility."  Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 869 (4th Cir. 1999) (citation omitted).  In 2009 (and again in 2010), the retaliation provision was amended to cover employee conduct "in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."  31 U.S.C. § 3730(h)(1).  The addition of this second prong necessarily broadens the provision's coverage by premising coverage on "efforts to prevent 1 or more violations" rather than on the distinct possibility of litigation.  See Fabula, 2017 WL 3180616, at *19 ("Prior to 2009, § 3730(h) provided a non-exclusive list of specific 'lawful acts' done in furtherance of an FCA action that protected an employee . . . . [T]he 2009 amendment had the effect of broadening the universe of protected conduct under § 3730(h), at least with respect to 'efforts to stop' FCA violations.").

v. Pfizer, Inc., 847 F.3d 52, 60 (1st Cir. 2017) (citation omitted).  In other words, "[m]erely grumbling to the employer about job dissatisfaction or regulatory violations does not . . . constitute protected activity." United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 743 (D.C. Cir. 1998).  Rather, the employee's investigation "must be directed at exposing a fraud upon the government." Fisch, 2012 WL 4049959, at *5 (citation omitted).

With respect to the notice requirement, a plaintiff claiming retaliation must establish that the employer had knowledge of the employee's protected activity.  The standard for notice is "flexible": "[T]he kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged." United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd., 389 F.3d 1251, 1260 (D.C. Cir. 2004) (citation omitted).  "Unless the employer is aware that the employee is investigating fraud, the employer [cannot] possess the retaliatory intent necessary to establish a violation of  § 3730(h)." Id. at 1260-61 (citation omitted).  An employee who simply engages in behavior wholly consistent with his job description will not, without more, provide notice that he is engaging in protected activity. Id. at 1261.  "[P]laintiffs alleging

that performance of their normal job responsibilities constitutes protected activity must overcome the presumption that they are merely acting in accordance with their employment obligations to put their employers on notice." Id. (citation omitted). Thus, where an employee is tasked with investigating fraud, he must go beyond the assigned task, for example, by alerting a party outside the usual chain of command, id., or "[c]haracterizing the employer's conduct as illegal [and] recommending that legal counsel become involved," Fisch, 2012 WL 4049959, at *6 (citation omitted).

Finally, while the Second Circuit has not defined the standard of causation for FCA retaliation claims, the Supreme Court has clarified that the term "because of" typically "imports, at a minimum, the traditional standard of but-for causation." EEOC v. Abercrombie & Fitch Stores, Inc., 135 S. Ct. 2028, 2032 (2015) (Title VII); see also Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013) (holding that Title VII retaliation claims "must be proved according to traditional principles of but-for causation, not the lessened [motivating-factor] causation test," and describing but-for causation as the background standard against which Congress legislates).

Temporal proximity between the protected activity and the retaliatory action may strengthen the inference of a causal connection.  See Gorman-Bakos v. Cornel Co-Op Extension of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001).

### A. Whether Fannie Mae is a Covered Entity Under the FCA

The defendants contend that Fannie Mae is not a covered entity under the FCA and that Lawrence was therefore not engaged in protected conduct when he complained about Seterus's dealings with Fannie Mae.  The FCA defines a "claim" as a request or demand for money or property that is either presented to an "officer, employee, or agent of the United States," 31 U.S.C. § 3729(b)(2)(A)(i), or "made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest," id. § 3729(b)(2)(A)(ii).[3]

The SAC relies solely on the assertion that Fannie Mae is a GSE as the basis for Lawrence's belief that his complaint concerned a claim made to an "officer, employee, or agent of the United States."  In opposing this motion, Lawrence relies as

---

[3] Section 3729(b)(2)(A)(ii) further requires that the United States Government provide "any portion of the money or property requested or demanded" or "reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  Id. § 3729(b)(2)(A)(ii)(I)-(II).

well upon the 2008 legislation that created a federal government conservatorship to put Fannie Mae in a solvent condition after that year's financial crisis.  See 12 U.S.C. § 4617.  Lawrence argues that this temporary federal conservatorship provided him with a good faith belief that his employer had committed, or was about to commit, fraud against the government, and that a reasonable employee in the same or similar circumstances might agree with that assessment.  Given the other deficiencies in the SAC, it is unnecessary to resolve whether Fannie Mae was a covered entity or whether a mistaken but good faith belief that it was would support an FCA claim.

**B.   Form 571 Claims**

As described above, the Form 571 Program allowed Seterus to obtain reimbursement from Fannie Mae for expenses incurred during the foreclosure process.  The SAC alleges that Lawrence, who is a CPA and was functioning for Seterus as a Lines Business Controls Analyst, became concerned that Seterus was not recording its foreclosure-related expenses and reimbursements from Fannie Mae in the same reporting period and that Seterus was therefore violating GAAP principles when it prepared its financial statements.

In March 2012, Lawrence performed an analysis of the accounting at Seterus of its Form 571 Program.  The SAC asserts

that Lawrence's June 26, 2012 Form 571 Report identified

weaknesses in Seterus's internal controls over that accounting.

In that report, Lawrence observed that Seterus's internal

"controls" appeared to involve "nothing more than to send over

an enormous number of expense claims to Fannie Mae and force

Fannie Mae to identify those that were improper."  In July,

Lawrence met with an IBM employee to discuss the alleged

"accounting fraud" identified in his Form 571 Report.[4]  In

September, Lawrence discussed with an IBM investigator Seterus's

failure to remedy the "financial risks" he identified in his

Form 571 Report.

As described in the SAC, Lawrence's Form 571 Report about

the accounting of the Form 571 Program expenses and receipts did

not constitute "protected conduct" under the FCA, and neither

that report nor his conversations about it put his employer on

notice that he was engaged in protected activity.  Nor does the

SAC plausibly plead but-for causation.

### 1.  Protected conduct

The SAC's allegations regarding the Form 571 Program

describe Lawrence's concerns regarding Seterus's financial

reporting -- in particular, Seterus's controls over its

---

[4] The SAC does not actually allege that the Form 571 Report
itself described any "accounting fraud."

accounting of expenses incurred in connection with, and receipts from, the Form 571 Program.  The SAC does not describe a concern that Seterus was engaged in defrauding Fannie Mae by filing false claims with Fannie Mae.  It does not allege, therefore, that Lawrence engaged in protected activity.

For example, the SAC does not allege that Lawrence believed any of the following: that Seterus was presenting false claims to Fannie Mae in connection with the Form 571 Program; that Seterus had omitted any potentially material information from the Form 571 claims that it submitted to Fannie Mae; that Seterus was receiving any money pursuant to these claims to which it was not entitled; that Seterus's submitted claims failed to comply with any statutory, regulatory, or contractual requirements; or that compliance with such requirements was a prerequisite to payment.  Cf. United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 26 (2d Cir. 2016) ("The FCA is not a general enforcement device for federal statutes, regulations, and contracts.  A false certification of compliance, without more, does not give rise to a false claim for payment unless payment is conditioned on compliance." (citation omitted)).  Accordingly, Lawrence's internal complaints about the quality of Seterus's internal controls over its accounting does not constitute FCA-protected activity.

### 2. Notice

For these same reasons, the SAC does not allege that Lawrence gave notice to his employer of any protected activity, to wit, that Seterus was defrauding Fannie Mae.  In his Form 571 Report, Lawrence "identified weaknesses" in Seterus's "internal controls as they relate to the Form 571 process."  This appears to relate directly to his responsibilities as an internal auditor for Seterus.

The SAC also alleges that the Form 571 Report characterized Seterus's deficient controls as "nothing more" than sending over "an enormous number of expense claims to Fannie Mae and forc[ing] Fannie Mae to identify those that were improper."  This allegation is also insufficient to plead that Lawrence put his employer on notice that he perceived that Seterus was engaged in a fraud on the government.

### 3. Causation

The SAC does not allege facts to support an inference that Lawrence's employment would not have been terminated but for his Form 571 Report and his discussion of it.  Lawrence's Form 571 Report was circulated in June 2012 -- almost six months before he was fired.  Furthermore, the SAC does not assert that Lawrence's communications with his supervisors in the days leading up to the termination of his employment referenced the

Form 571 accounting issues.  The SAC's conclusory assertion that Seterus's reason for terminating Lawrence employment was "false" and a "pretext for unlawful retaliation" are entitled to no deference on a motion to dismiss.  "[W]hile a court must accept all of the allegations contained in a complaint as true, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  Balintulo v. Ford Motor Co., 796 F.3d 160, 165 (2d Cir. 2015) (citation omitted).

### C.    BRP Response Collection Rate

The BRP Program, as explained above, allowed Seterus to obtain incentive payments from Fannie Mae if it collected complete BRP responses from 60% of a given pool.  According to the SAC, in September 2012, Lawrence learned that "faulty" logic within Seterus's database resulted in the submission of BRP responses incorrectly marked as "complete" to Fannie Mae.  An audit of a statistically significant sample of the claims found that only 42% identified within the database as complete were actually complete.  On December 5 and 7, Lawrence reported to Seterus that the deficiencies in its internal controls meant that Seterus could not ensure that accuracy of its reports to Fannie Mae of its BRP collection rate.  Seterus fired Lawrence on December 10.

The SAC does not allege either that Lawrence engaged in protected activity, as that term is defined under the FCA, or that he reported to Seterus a concern that it was defrauding Fannie Mae. Accordingly, the FCA retaliation claim premised on Seterus's BRP Program is dismissed as well.

## 1. Protected conduct

Lawrence was not engaging in protected activity when he reported his concerns about the adequacy of Seterus's internal controls over the BRP database and its potential effect on Seterus's BRP submissions. First, as an internal auditor, and as an employee completing the Seterus Employee Fraud Prevention Scorecard, the identification of weaknesses in internal controls was part and parcel of his job responsibilities. Second, a report of concerns over the adequacy of internal controls is not a statement of belief that Seterus was engaged in a fraud upon Fannie Mae. Far from it, the SAC explains that the misidentification of certain BRP responses in the internal database was due to "faulty" business logic in the computer program as opposed to the submission of knowingly false claims for bonus payments.

Moreover, it is helpful to remember that the entitlement to bonus payments from Fannie Mae under the BRP

Program was premised on the collection of 60% of BRP responses from a given pool.  The BRP responses themselves were not requests for payment.

## 2.  Notice

For these same reasons, the SAC does not allege that Lawrence gave notice to his employer of a perceived fraud on Fannie Mae.  In December 2012, Lawrence responded to an Employee Fraud Prevention Scorecard[5] with the observation that he was concerned about "overstated BRP collection rates."  When Seterus followed up on that expressed concern, Lawrence observed that Seterus had a duty to ensure the accuracy of its claims and to institute controls to do so.  These statements appear to involve nothing more than what he was obligated to disclose as an auditor and as an employee responding to the Scorecard. Moreover, the SAC does not allege that in communicating his concerns regarding the BRP collection rates, Lawrence ever discussed a perceived fraud on Fannie Mae.

In opposition to this motion, Lawrence essentially concedes that he never reported a concern that Seterus was actually engaged in defrauding Fannie Mae.  He argues that he relied upon his supervisors to draw this connection: "Any [Seterus] employee

_____

[5] The SAC does not explain what an Employee Fraud Prevention Scorecard is, nor what, specifically, Lawrence disclosed within his scorecard.

with even a minimal understanding of the BRP program would recognize that 'overstat[ing] BRP collection rates' is the equivalent of submitting a false claim for payment."  Where there is nothing in the SAC to suggest that Lawrence's complaints concerned anything beyond Seterus's internal controls and the accuracy of its BRP database, the SAC fails to satisfy the FCA's notice requirement.

**IV.  Dodd-Frank Act Retaliation Claim**

The whistleblower provision of Dodd-Frank provides:

No employer may discharge . . . or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower --

(i) in providing information to the Commission in accordance with this section;

(ii) in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or

(iii) in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 . . . this chapter . . . and any other law, rule, or regulation subject to the jurisdiction of the Commission.

15 U.S.C. § 78u-6(h)(1)(A) (citation omitted).  The Sarbanes-Oxley Act, incorporated by reference into 15 U.S.C. § 78u-6(h)(1)(A)(iii), provides that a publicly traded company or its subsidiary cannot discharge an employee because the employee provides information "regarding any conduct which the employee

reasonably believes constitutes a violation of section 1341,

1343, 1344, or 1348, any rule or regulation of the Securities

and Exchange Commission, or any provision of Federal law

relating to fraud against shareholders."  18 U.S.C. §

1514A(a)(1).

The elements of a retaliation claim under Dodd-Frank are

"(1) that the plaintiff engaged in a protected activity, (2)

that the plaintiff suffered an adverse employment action, and

(3) that the adverse action was causally connected to the

protected activity."  Vista Outdoor Inc. v. Reeves Family Trust,

16cv5766 (JSR), 2017 WL 571017, at *9 (S.D.N.Y. Feb. 13, 2017).

To state a claim under Dodd-Frank, a plaintiff must

plausibly allege that he had an objectively reasonable belief

that the defendant's conduct violated one of the enumerated

provisions of law.  Nielsen v. AECOM Tech. Corp., 762 F.3d 214,

222 (2d Cir. 2014).  "The statute does not specify what, in

particular, a purported whistleblower must establish to

demonstrate that criminal fraud or securities-related

malfeasance is afoot."  Id. at 221.  While a whistleblower need

not establish that the employer's conduct actually violated an

enumerated provision of the securities laws, see Guyden v.

Aetna, Inc., 544 F.3d 376, 384 (2d Cir. 2008) ("[A]

whistleblower need not show that the corporate defendant

committed fraud to prevail in her retaliation claim.")
(discussing 18 U.S.C. § 1514A), the Second Circuit has expressed
skepticism toward the proposition that a whistleblower's
complaint "need not even approximate specific elements of the
enumerated provisions alleged violated, or that there is no
requirement that the violation must be material." Nielsen, 762
F.3d at 221 n.6.  In other words, a whistleblower must plausibly
allege that he "reported information based on a reasonable
belief that the employer violated one of the enumerated
provisions set out in the statute." Id. (analyzing 18 U.S.C. §
1514A(a)(1)).  Thus, "to be reasonable, the purported
whistleblower's belief cannot exist wholly untethered from these
specific provisions." Id.

The "critical focus" of the statute is "whether the
employee reported conduct that he or she reasonably believes
constituted a violation of federal law." Id. at 221 (citation
omitted).  The "reasonable belief" standard contains both
subjective and objective components: a plaintiff "must show not
only that he believed that the conduct constituted a violation,
but also that a reasonable person in his position would have
believed that the conduct constituted a violation." Id.
(citation omitted).  "The objective prong of the reasonable
belief test focuses on the basis of knowledge available to a

reasonable person in the circumstances with the employee's training and experience." Id. (citation omitted).

Like the FCA, the Dodd-Frank whistleblower provision uses the phrase "because of" to describe the causal connection that must be established between the protected conduct and the adverse employment action. Accordingly, for the reasons set forth above, the plaintiff must demonstrate that his employment would not have been terminated but for his protected conduct. See Abercrombie, 135 S. Ct. at 2032.

The SAC alleges that Lawrence engaged in activity protected by Dodd-Frank when he spoke of concerns regarding the Form 571 Program accounting. In opposition to this motion, Lawrence seeks to add to this claim his concerns, expressed in December 2012, about overstated BRP response collection rates in the Seterus database. This latter claim, which is not fairly stated in the SAC, is also addressed below.

## A.    Form 571 Accounting

Lawrence claims that he discovered a violation of GAAP while analyzing the accounting for the Form 571 Program, and that such "irregular" accounting practices constituted securities fraud. Lawrence has failed to state a retaliation claim because he has not plausibly pled that this alleged GAAP violation was material to shareholders, that he believed that it

might be, that such a belief would have been reasonable, or that he ever expressed such a concern during his employment.

In assessing the materiality of an omission or misstatement, courts must evaluate "whether there is a substantial likelihood that the disclosure of the omitted information would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Stadnick v. Vivint Solar, Inc., 861 F.3d 31, 37 (2d Cir. 2017) (citation omitted). In other words, there must be a "substantial likelihood that a reasonable investor would find the omission or representation important in making an investment decision." United States v. Vilar, 729 F.3d 62, 88 (2d Cir. 2013) (citation omitted). "[B]ecause materiality is a mixed question of law and fact . . . [a] complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 96 (2d Cir. 2016) (citation omitted).

Here, the SAC does not plausibly allege that Lawrence held a reasonable belief that his disclosures regarding the Form 571 accounting would have materially impacted the relevant

34

financials.  As a wholly owned subsidiary, Seterus's financial

results were reported on IBM's financial statements.[6]  According

to the SAC, Lawrence's Form 571 Report expressed concern

regarding Seterus's poor internal controls and the effect that

those imperfect controls had on the company's submissions to

Fannie Mae.  It is assumed for purposes of this discussion,

although this is not clearly alleged, that the report and

Lawrence's subsequent discussions of the report also expressed

concern over whether the Form 571 Program expenses and receipts

were being reported together, in the appropriate period, on

publicly filed financial statements, as required under GAAP.

The SAC does not describe, however, that during his employment

Lawrence ever developed a belief of the extent to which this

GAAP error might affect the accuracy of the IBM financial

statements, much less that he expressed to anyone at Seterus or

IBM that the error in the GAAP accounting of the Form 571

Program expenses and receipts could have a potentially material

effect on those statements.  Accordingly, the SAC has not

---

[6] The SAC does not identify the financial statements at issue.
The parties' motion papers acknowledge that the Seterus
financial results were reported on IBM's financial statements.
Because the Dodd-Frank claim rests on the SAC's assertion that
Lawrence believed the financial statements violated GAAP
accounting principles, and because the SAC identifies him as a
CPA working for Seterus in an audit capacity, for this limited
purpose it is appropriate to deem the relevant financial
statements as integral to the SAC's claims.

plausibly alleged that Lawrence, an experienced accountant, held a reasonable belief of a securities law violation, much less that he ever expressed such a concern.

This conclusion is particularly appropriate when a plaintiff functions, as Lawrence did, as an internal auditor and is charged with responsibility for evaluating and commenting on the quality of internal controls and compliance with GAAP accounting. Every observation by such an employee about imperfections in the internal controls and accounting systems in an organization does not and should not constitute protected activity under Dodd-Frank. Where, however, such an employee has a reasonable basis to believe that a filing governed by the securities laws contains a materially false statement, and alerts his employer of that concern, then that employee is protected from retaliation by Dodd-Frank.

### B. BRP Response Collection Rate

As noted above, the SAC's Dodd-Frank claim does not rest on Lawrence's reports to Seterus about the "faulty logic" in Seterus's database regarding BRPs. The thrust of the SAC's assertions regarding the BRP Program is a concern with the impact on Fannie Mae, not on the securities markets. It claims that the faulty logic in the database led Seterus to incorrectly identify "completed" BRP responses to Fannie Mae.

In opposition to this motion, however, Lawrence argues that his Dodd-Frank claim should be read to encompass the allegations regarding the BRP Program. He points out that the SAC calculates that the database errors resulted in "an erroneous cost to Fannie Mae of $12,954,500" over approximately three quarters of a year.[7] He reasons that erroneous receipt of income necessarily overstates a company's financial position. These allegations fail to support a plausible Dodd-Frank retaliation claim.

The SAC does not allege that Lawrence ever reported to anyone at Seterus or IBM his belief that the BRP database error was affecting the accuracy of any financial reporting. Nor does the SAC allege that Lawrence ever quantified for himself or anyone during his employment the extent to which the database error could be affecting the accuracy of reported financial results. There is no basis to infer based on the SAC's allegations that Lawrence held a reasonable belief during his

---

[7] The SAC's description of the BRP Program and its calculation of erroneously received payments are not consistent with each other. As described in the SAC, no single completed BRP entitled Seterus to a payment, and a BRP did not constitute a claim for a payment. Instead, payments to Seterus were predicated on the calculation of a rate of completed BRPs in a designated pool. Nonetheless, for purposes of this motion, it is assumed that there is an adequate basis to allege Seterus's receipt of almost $13 million from Fannie Mae to which Seterus was not entitled.

employment that, in effect, the securities laws were being violated in connection with the BRP Program accounting or that he reported such a belief.

In opposition to this motion, Lawrence speculates that the discovery by Fannie Mae of the irregularities in the BRP completion rate reports "[c]ould have led to some kind of additional penalty" and perhaps "a complete cancellation of Defendants' contract with Fannie Mae," and that that cancellation would have materially impacted a shareholder's decision to invest in IBM.  Of course, the SAC reports both that Fannie Mae conducted an audit of the BRP program at Seterus in the month before Lawrence was fired, and that Seterus passed the audit.  In any event, the SAC does not allege that Lawrence considered and described this parade of horribles to Seterus and was fired in retaliation for doing so.  Nor does the opposition memorandum suggest that such allegations could be properly included in a pleading.

### C.   Lawrence's Request to Amend the SAC

In opposition to this motion, Lawrence seeks leave to amend his complaint to add assertions regarding materiality.  He does not identify any addition that would alter the analysis on which this Opinion rests.  "Leave to amend may properly be denied if the amendment would be futile."  Krys v. Pigott, 749 F.3d 117,

134 (2d Cir. 2014).  "A proposed amendment to a complaint is futile when it could not withstand a motion to dismiss." Balintulo, 796 F.3d at 164-65 (citation omitted); see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 190 (2d Cir. 2015) (leave to amend properly denied "where the request gives no clue as to how the complaint's defects would be cured" (citation omitted)).

In addition, Lawrence's request comes too late.  The defendants filed their motion to dismiss on December 5. Lawrence was aware of this motion and the defendants' arguments regarding materiality and other matters in advance of the December 9 conference.  At the conference Lawrence's counsel confirmed that he did not intend to file a third amended complaint.  Nevertheless, the December 9 Order afforded Lawrence an additional opportunity to do so.  Lawrence did not avail himself of this additional opportunity to amend.  Accordingly, Lawrence's request to amend his complaint is denied.

## CONCLUSION

The defendants' December 5, 2016 motion to dismiss claims against IBM is granted.  The defendants' motion to dismiss the FCA and Dodd-Frank retaliation claims is also granted.


Dated:    New York, New York
          August 1, 2017

                              _____
                                    DENISE COTE
                         United States District Judge